**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| AISHA JONES,<br>*Plaintiff* | : | CASE NO. |
| v. | : | JURY TRIAL DEMANDED |
| BAYER CORPORATION,<br>BAYER HEALTHCARE PHARMACEUTICALS,<br>and BAYER HEALTHCARE, LLC<br>*Defendants* | : | SEPTEMBER 12, 2024 |

**COMPLAINT**

## I. INTRODUCTION:

1. This is an Action for violation of Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m, *et seq*.

## II. PARTIES:

2. At all times set forth herein, the Plaintiff, Aisha Jones, was a resident of East Hartford, Connecticut.

3. At all times set forth herein, Bayer Corporation (hereinafter "Defendant Bayer") was a German foreign corporation and manufacturer of pharmaceutical products conducting business within the State of Connecticut, with a place of business located at 100 Bayer Road in Pittsburgh, Pennsylvania, 15205.

4. At all times set forth herein, Bayer Healthcare Pharmaceuticals, Inc. (hereinafter "Defendant BHPI") was a foreign corporation and manufacturer of pharmaceutical products conducting business within the State of Connecticut, with a place of business located at 100 Bayer Boulevard in Whippany, New Jersey, 07981.

5. At all times mentioned herein, Bayer Healthcare, LLC (hereinafter "Defendant

Bayer Healthcare") was a foreign company and manufacturer of pharmaceutical products conducting business within the State of Connecticut, with a place of business located at 100 Bayer Boulevard in Whippany, New Jersey, 07981.

6. Defendant Bayer, Defendant BHPI, and Defendant Bayer Healthcare (collectively "the Bayer Defendants") were the manufacturer of the "Essure" permanent birth control device which is a coil device that is surgically implanted into the fallopian tubes of a woman for the intended purpose of providing a permanent method of birth control.

## III. JURISDICTION:

7. This Court has diversity jurisdiction over this Action pursuant to 28 USC § 1332, insomuch as Plaintiff is a resident of the State of Connecticut and the Bayer Defendants are residents of other states.

8. Venue in the District of Connecticut is proper because at all times relevant, Plaintiff resided in Connecticut, Defendant sold the Essure product in Connecticut, and the events giving rise to this Action occurred in Connecticut.

## IV. ALLEGATIONS:

9. Essure had Conditional Premarket Approval ("CPMA") by the Food and Drug Administration ("FDA"). As discussed below, Essure became "adulterated" and "misbranded", pursuant to (1) the FDA due to the Defendants' failure to conform with the FDA requirements prescribed in the CPMA and (2) violations of federal statutes and regulations noted *infra*.

10. Pursuant to the Bayer Defendants CPMA (which reads: "Failure to comply with conditions of approval invalidates this approval order"), the C.F.R, and Federal Food, Drug and Cosmetic Act ("FD&C Act"), the product is "adulterated" and "misbranded" and could not have been marketed or sold to the Plaintiff.

11. Specifically, Essure was adulterated and misbranded as the Bayer Defendants: (1) failed to meet regular reporting requirements; (2) failed to report known hazards to the FDA; and (3) failed to comply with federal laws regarding marketing and distribution as specifically described *infra*.

12. The Plaintiff's causes of action are all based on deviations from the requirements in the CPMA and/or violations of federal statutes and regulations.

13. Essure consists of: (1) micro-inserts; (2) a disposable delivery system; and (3) a disposable split introducer. All components are intended for a single use.

14. The micro-inserts are comprised of two metal coils which are placed in a woman's fallopian tubes via the Bayer Defendants' disposable delivery system and under hysteroscopic guidance (camera).

15. The hysteroscopic equipment needed to place Essure was manufactured by a third party, is not a part of Bayer Defendants' CPMA, and is not a part of Essure. However, because the Plaintiff's implanting physician did not have such equipment, the Bayer Defendants provided it so that it could sell Essure.

16. The metal coils are comprised of nickel, steel, nitinol, and PET fibers or, said differently, are metal-on-metal.

17. The Bayer Defendants' disposable delivery system consists of a single handle which contains a delivery wire, release catheter, and delivery catheter. The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery, and release. Physicians are allowed to visualize this complicated process through the hysteroscopic equipment provided by the Bayer Defendants.

18. After placement of the coils in the fallopian tubes by the Bayer Defendants'

disposable delivery system, the micro-inserts expand upon release and are intended to anchor into the fallopian tubes. The PET fibers in the coil allegedly elicit tissue growth blocking off the fallopian tubes.

19. The coils are alleged to remain securely in place in the fallopian tubes for the life of the consumer and not migrate, break, or corrode.

20. After three months following the device being implanted, patients are to receive a "Confirmation" test to determine that the micro-inserts are in the correct location and that the tissue has created a complete occlusion. This is known as a hysterosalpinogram ("HSG Test" or "Confirmation Test").

21. Regardless of the Confirmation Test, the Bayer Defendants warrant that Essure allows for visual confirmation of each insert's proper placement during the procedure.

22. Essure was designed, manufactured, and marketed to be used by the average gynecologists throughout the world, as a "quick and easy" and "non-surgical" outpatient procedure to be done without anesthesia.

23. The Bayer Defendants also trained physicians on how to use its device and other hysteroscopic equipment, including the Plaintiff's implanting physician.

24. By way of background, Premarket Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. According to the FDA, Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

25. PMA is intended to be a stringent type of device marketing application required by the FDA. The applicant must receive FDA approval of its PMA application prior to marketing

the device. PMA approval is based on a determination by the FDA.

26. An approved PMA is, in effect, a private license granting the applicant (or owner) permission to market the device-assuming it complies with federal laws, any CPMA order and is not "adulterated" or "misbranded."

27. FDA regulations provide 180 days to review the PMA and make a determination. In reality, the review time is normally longer. Before approving or denying a PMA, the appropriate FDA advisory committee may review the PMA at a public meeting and provide the FDA with the committee's recommendation on whether the FDA should approve the submission.

28. However, the PMA process for Essure was "expedited" and several trial candidates' medical records were altered to reflect favorable data.

29. According to the FDA, a Class III device that fails to meet CPMA requirements is considered to be adulterated under section 501(f) of the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and cannot be marketed, distributed, or advertised under 21 C.F.R. § 814.80.

30. Regarding the Premarket Approval Process, devices can either be "approved," "conditionally approved," or "not approved."

31. Essure was "conditionally approved" or in other words, had only CPMA not outright PMA, the "gold standard."

32. In the CPMA Order issued by the FDA, the FDA expressly stated, "Failure to comply with the conditions of approval invalidates this approval order."

33. The following were conditions of approval:

(a) "Effectiveness of Essure is established by annually reporting on the 745 women who took part in clinical tests."

(b) "Successful bilateral placement of Essure is documented for newly trained

physicians."

(c) "Within 10 days after [the Bayer Defendants] receives knowledge of any adverse reaction to report the matter to the FDA."

(d) "Report to the FDA whenever it receives information from any source that reasonably suggests that the device may have caused or contributed to a serious injury."

(e) Effectiveness of Essure is established by annually reporting on the 745 women who took place in the clinical tests.

(f) Successful bilateral placement of Essure is documented for newly trained physicians.

(g) Warranties are truthful, accurate, and not misleading.

(h) Warranties are consistent with applicable Federal and State law.

(i) Conduct a post approval study in the US to document the bilateral placement rate for newly trained physicians.

(j) Include results from the annual reporting on the patients who took part in the Pivotal and Phase II clinical investigations in the labeling as this data became available.

(k) Submit a PMA supplement when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device facilitates, necessitate a labeling, manufacturing, or device modification.

(l) Submit a PMA supplement whenever there are changes to the performance of the device.

34. After obtaining the CPMA, the Bayer Defendants became aware of potential quality

and failure modes associated with Essure and failed to warn the Plaintiff and/or her implanting physician. The Defendants became aware that the following failures could occur with the device and lead to adverse consequences for the patient:

(a) The stainless steel used in Essure can become un-passivated, which allows it to rust and degrade;

(b) The nitinol could have a nickel rich oxide, which the body attacks;

(c) The "no lead" solder could in fact have trace lead in it;

(d) The galvanic action between the metals used to manufacture Essure, which causes the encapsulation of the product within the fallopian tubes, could be a continuous irritant to some patients;

(e) The nitinol in the device can degrade due to high nickel ion release, increasing the toxicity of the product for patients;

(f) Latent manufacturing defects, such as cracks, scratches, and other disruption of the smooth surface of the metal coil, may exist in the finished product, causing excess nickel to leach into the surrounding tissues after implantation;

(g) Degradation products of PET used in the implant can be toxic to patients, inciting both chronic inflammation and possible autoimmune issues; and

(h) The mucosal immune response to nickel is different than the immune response in non-mucosal areas of the body.

35. Moreover, the Bayer Defendants did not provide the requisite training to the implanting physician prior to selling it to the same.

36. This belated and untimely release of relevant and important information led to an

increasing number of adverse events being reported to the FDA about Essure from patients and physicians. Because of these complaints, the FDA convened a public hearing concerning the safety and efficacy of the Essure device on September 24 and 25, 2015. At that public hearing, the Defendants continued to misrepresent the safety and efficacy of Essure:

(a) Specifically the Bayer Defendants testified that skin patch testing is not a reliable predictor of clinically significant reactions to nickel-containing implantable devices, including Essure. Despite this, the Bayer Defendants told physicians and patients that a nickel sensitivity test was sufficient to determine whether a patient was a suitable candidate for an Essure device.

37. On February 29, 2016, the FDA announced "actions to provide important information about the risks of using Essure and to help women and their doctors be better informed of the potential complications associated with" the device. The FDA took the following actions:

(a) The FDA is requiring the Bayer Defendants to implement a Patient Decision Checklist "to help to ensure women receive and understand information regarding the benefits and risks" of Essure. The FDA's draft Patient Decision Checklist is a five-page document that the physician will discuss with each patient interested in using the device. The patient must initial after each topic of discussion, and both the physician and patient must sign the document. The topics for discussion include, *inter alia*, the risks for "adverse events including persistent pain, device puncture of the uterus and/or fallopian tubes ('perforation'), or movement of the device into the abdomen or pelvis ('intra- peritoneal migration')"; "allergy or

hypersensitivity reactions"; symptoms such as changes in skin (rash, itching), "chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting"; "joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes"; the fact that "there is no reliable test to predict ahead of time who may develop a reaction to the device"; the possibility that the Essure device "can move after placement," possibly becoming ineffective at preventing pregnancy or leading to "serious adverse events such as bleeding or bowel damage, which may require surgery to address"; and the fact that if the Essure device has to be removed after placement, it will require surgery to remove and possibly a hysterectomy.

38. Unfortunately, this new warning, labeling, and patient decision checklist came too late to warn the Plaintiff of the true risks of Essure. Had the Bayer Defendants complied with their federal regulatory duties and their duties under state law by reporting the known risks and complications in a timely fashion, the Plaintiff and her physician would have had this relevant, critical information available to them prior to the implant of the Essure device.

39. At all relevant times, the Bayer Defendants' Essure product was prescribed and used as intended by the Bayer Defendants and in a manner reasonably foreseeable to the Bayer Defendants. Moreover, the Defendants misrepresentations regarding Essure discussed *infra*, in effect, over-promoted Essure and nullified otherwise adequate warnings.

40. In short, Essure is considered an "adulterated" and "misbranded" product that could not have been marketed or sold to the Plaintiff per the FDA and Federal law and all of Plaintiff's

claims center around violations of the CPMA requirements and/or Federal regulations and statutes.

41. Because Essure was the first device of its kind, the implanting physician was trained by the Bayer Defendants on how to properly insert the micro-inserts using the disposable delivery system and was given hysteroscopic equipment by the Bayer Defendants.

42. In order to capture the market, the Bayer Defendants independently undertook a duty of training physicians outside of FDA guidelines, including Plaintiff's implanting physician, on how to properly use its own mechanism of delivery and the specialized hysteroscopic equipment manufactured by a third party.

43. Regarding Essure, Bayer Defendants' Senior Director of Global Professional Education, stated, "training is the key factor when clinicians choose a new procedure" and "For the Essure procedure, the patient is not under anesthesia, therefore a skilled approach is crucial."

44. In fact, because gynecologists and the Plaintiff's implanting physician were unfamiliar with the device and how to deliver it, the Bayer Defendants:

(a) created a "Physician Training Manual";

(b) created a simulator called EssureSim;

(c) organized limited training courses-where the Bayer Defendants observed physicians until the Bayer Defendants believed they were competent;

(d) created Essure Procedure Equipment Supplies Checklists; and

(e) represented to the Plaintiff that "Physicians must be signed-off to perform Essure procedures."

45. The Bayer Defendants provided no training to the implanting physician on how *to remove* Essure should it migrate.

46. The Bayer Defendants also kept training records on all physicians "signed-off to perform Essure procedures."

47. In order to sell their product and because the implanting physician did not have access to the expensive hysteroscopic equipment, the Bayer Defendants provided the implanting physician with hysteroscopic equipment which, although it is not a part of Essure, is needed to implant Essure. The entrustment of this equipment is not part of any CPMA.

48. In fact, upon information and belief, the Bayer Defendants entered into agreements with Johnson & Johnson Co., Olympus America, Inc., Richard Wolf Medical Instruments Corp., and Karl Storz Endoscopy, America, Inc. to obtain specialized hysteroscopic equipment to then give to physicians and to increase its sales force to promote Essure.

49. According to the Bayer Defendants, these agreements allowed the Bayer Defendants to "gain market presence...and expand ... market opportunity by driving adoption among a group of physicians."

50. In regard to the entrustment of such specialized equipment, the Bayer Defendants admitted: "We cannot be certain how successful these programs will be, if at all." *See US SEC Form 10-Q: Quarterly Report Pursuant to Section 13 or 15(d) of the SEC Act of 1934*.

51. The Bayer Defendants "handed out" this hysteroscopic equipment to unqualified physicians, including the Plaintiff's implanting physician, in an effort to sell its product.

52. The Bayer Defendants knew or failed to recognize that the implanting physician was not qualified to use such specialized equipment yet provided the equipment to the unqualified implanting physician in order to capture the market.

53. Upon information and belief, in return for providing the expensive hysteroscopic equipment, the Bayer Defendants required that the implanting physician purchase two Essure

"kits" per month. This was a part of the Bayer Defendants' unreasonably dangerous and negligent distribution plan aimed solely at capturing the market with reckless disregard for the safety of the public and the Plaintiff.

54. This distribution plan created an environment which induced the implanting physician to "push" Essure and implant the same into the Plaintiff.

55. In short, the Bayer Defendants used the expensive hysteroscopic equipment to induce the implanting physicians into an agreement as "bait." Once the implanting physician "took the bait" he/she was required to purchase two (2) Essure "kits" per month, regardless of whether he sold any Essure "kits".

56. This was an unreasonably dangerous distribution scheme as it compelled the implanting physician to sell two (2) devices per month at the expense of the Plaintiff's safety and well-being.

57. The Bayer Defendants' distribution plan also included:

(a) negligently distributing Essure in violation of FDA orders and Federal regulations;

(b) marketing and selling an "adulterated" and "misbranded" product;

(c) promoting Essure through representatives of the hysteroscopic equipment manufacturers, who were not adequately trained nor had sufficient knowledge regarding Essure;

(d) failing to report and actively concealing adverse events which occurred as a result of Essure;

(e) erroneously using non-conforming material and failing to keep track of the same in the manufacturing of Essure;

(f) failing to use pre-sterile and post-sterile cages;

(g) manufacturing Essure at an unlicensed facility and,

(h) manufacturing Essure for three years without a license to do so.

58. In short, the Bayer Defendants:

(a) failed to abide by FDA-approved training guidelines when training the Plaintiff's implanting physician;

(b) provided specialized hysteroscopic equipment to implanting physicians who were not qualified to use the same; and,

(c) created an unreasonably dangerous distribution and reporting plan aimed at capitalizing and monopolizing the birth control market

59. All of this was done in violation of Federal law and its CPMA at the unfortunate expense of the Plaintiff's safety.

60. On or about August 13, 2015, the Plaintiff underwent a medical procedure involving a hysteroscopic tubal occlusion in which the aforementioned Essure medical device was implanted into her fallopian tubes.

61. In the years following the implanting procedure, the Essure medical device broke, migrated from Plaintiff’s fallopian tubes, and / or caused a puncture of her fallopian tubes and / or other organs.

62. As a result of the foregoing occurrence or occurrences, the Plaintiff experienced painful cramping, vaginal bleeding, dizziness, and bladder problems including incontinence.

63. On August 23, 2023, the Plaintiff underwent a medical procedure to remove the Essure medical device involving laparoscopic adnexal structure excision and a bilateral salpingectomy in which both of her fallopian tubes were removed.

64. As a result of the foregoing procedure, and the Bayer Defendants' conduct, Plaintiff experiences severe pain due to nerve damage related to the removal surgery. Plaintiff has sustained significant pain, suffering, and mental anguish on account of the Essure medical device and its implementation.

65. As a further result of the Bayer Defendants' conduct, Plaintiff was compelled to expend large sums of money for medical treatment, hospital bills and medicine, all to her loss and damage.

66. The Bayer Defendants undertook an independent duty to train physicians on how to properly use its device to place the micro-inserts which failed to abide by FDA training guidelines.

67. The Bayer Defendants are liable for harm caused to the Plaintiff under Connecticut General Statute § 52-572q by failing to provide adequate instructions for the implanting of the Essure medical device.

68. Instructions were required under C.G.S. § 52-572q because of the likelihood that Essure would cause harm, the nature of that harm is serious, and the product seller is able to anticipate that the product user would not be aware of product risks. This is evidenced in Essure's Class III categorization by the FDA because it presents a potential, unreasonable risk of illness or injury.

69. The Bayer Defendant: (1) created an Essure Training Program; (2) created a simulator called EssureSim; (3) organized limited training courses-where the Bayer Defendants observed physicians until the Bayer Defendants believed they were competent; (4) created Essure Procedure Equipment Supplies Checklists; and (5) represented to the Plaintiff that "Physicians must be signed-off to perform Essure procedures."

70. As part of the Bayer Defendants' training, they had a duty to abide by the FDA training guidelines for the implanting physician on how to place Essure using their own delivery system, certify the implanting physician, and oversee this particular procedure. They also had a duty to disclose adverse events to the physicians so that they in turn could properly advise their patients of the actual risks.

71. Specifically, pursuant to the FDA-approved training regulations and guidelines, the Bayer Defendants had a duty to comply with the following Federal requirements so that implanting physicians performed "competent procedures" and would be able to "manage possible technical issues" to:

(a) Ensure that the implanting physician completed the required preceptoring (generally 5 cases) in Essure placement until competency;

(b) Ensure that the implanting physician had read and understood the Physician Training Manual;

(c) Ensure that the implanting physician had "successful completion of Essure Simulator Training"; and

(d) Ensure that the implanting physician was certified under the preceding requirements.

72. As outlined in the Physicians Manual, these requirements were necessary to:

(a) Ensure that the implanting physician was selecting appropriate patients from Essure;

(b) Ensure that the implanting physician was appropriately counseling the Plaintiff on the known risks; and

(c) Ensure the implanting physician was qualified and competent to perform

the Essure procedure to ensure proper placement to preclude migration, perforation and fracturing of coils.

73. The Bayer Defendants breached this duty and parallel state law thereby departing from the FDA-approved guidelines by:

(a) Not ensuring that the Implanting Physician completed the required preceptoring in Essure placement until competency. The Implanting Physician did not complete the required preceptoring until competency requirement;

(b) Not ensuring that the implanting physician had read and understood the Physician Training Manual. The implanting physician did not understand the Physician Training Manual;

(c) Not ensuring that the implanting physician had "successful completion of Essure Simulator Training." The implanting physician did not successfully complete the Essure Simulator Training; and

(d) Not ensuring that the implanting physician was certified under the preceding requirements. The Implanting Physician was not certified under the Defendants' requirements.

74. The Bayer Defendants' departure from the training guidelines indicates that the instructions provided by the Bayer Defendants to Plaintiff's physician for implanting the Essure device were inadequate under C.G.S. § 52-572q.

75. This departure from the training guidelines caused the Essure coils to migrate from the fallopian tube and caused the following specific injuries (hysteroscopy and bilateral salpingectomy to remove Essure device; permanent and irreversible removal of the Plaintiff's

fallopian tubes and nerve damage due to fallopian tube removal procedure) because:

(a) The Essure Training Program ensured proper placement and without it, the implanting physician's technique caused the coils to migrate, perforate, and/or fracture producing the damages noted above;

(b) The required preceptoring ensured proper placement and without it, the implanting physician's technique caused the coils to migrate, perforate, and/or fracture producing the damages noted above;

(c) The requirement to read and understand the Physician Training Manual ensured proper placement, and without it, the implanting physician's technique caused the coils to migrate, perforate, and/or fracture producing the damages noted above;

(d) The required monitoring ensured that the coils were properly placed and without the proper monitoring caused the coils to migrate, perforate, and/or fracture producing the damages noted above;

(e) The requirement that the implanting physician be certified under the above requirements ensured that the coils were properly placed and the fact that the implanting physician was not certified caused the coils to migrate, perforate, and/or fracture producing the damages noted above.

76. This breach caused the Plaintiff's damages. Specifically, the Essure device migrated from Plaintiff's fallopian tube resulting in a hysteroscopy and bilateral salpingectomy to remove the Essure device; permanent and irreversible removal of the Plaintiff's fallopian tubes and nerve damage due to fallopian tube removal procedure.

77. As a result of the Bayer Defendants' negligence, the Plaintiff sustained the

following injuries all of which could be permanent in nature: hysteroscopy and bilateral salpingectomy to remove Essure device; permanent and irreversible removal of the Plaintiff's fallopian tubes and nerve damage due to fallopian tube removal procedure.

78. As a further result of the Bayer Defendants' negligence, the Plaintiff had to undergo numerous surgical procedures, diagnostic procedures, and may have to undergo surgeries, diagnostic testing, treatment and rehabilitation into the indefinite future.

79. As a further result of the Bayer Defendants' negligence, the Plaintiff sustained significant pain and suffering, both physical and mental, and will continue to do so into the indefinite future.

80. As a further result of the Bayer Defendants' negligence, the Plaintiff was compelled to expend and will be obliged in the future to expend large sums of money for medical treatment, hospital bills and medicine, all to her loss and damage.

81. As a further result of the Bayer Defendants' negligence, the Plaintiff has lost, or been restricted in, the ability to enjoy life's pleasures.

***Wherefore***, the Plaintiff demands the following relief:

1. A trial by jury;

2. Money damages;

3. Allowable costs;

4. All such additional relief the Court deems just and proper.

THE PLAINTIFF
AISHA JONES

BY: ______________________

Michael J. Reilly, Esq. (ct28651)
CICCHIELLO & CICCHIELLO, LLP
364 Franklin Avenue
Hartford, CT 06114
Tel: 860-296-3457
Fax: 860-296-0676
Email: mreilly@cicchielloesq.com